UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLOW B.,[1]

                              Plaintiff                    DECISION AND ORDER

-vs-

                                                        6:20-CV-6891 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Supplemental Security Income ("SSI") benefits. Now before the Court is Plaintiff's motion (ECF No.10) for judgment on the pleadings and Defendant's cross-motion (ECF No. 11) for the same relief. For the reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).  Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v.*

*Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

In the administrative proceedings before the Commissioner, Plaintiff claimed to have become disabled as of January 4, 1999, though she did not file her SSI application until November 4, 2017. Plaintiff claimed disability due to mental impairments and hearing loss.[3] Subsequent to her application, and prior to the hearing, Plaintiff had two brief stints of employment, neither of which met the Commissioner's definition of substantial gainful employment ("SGA"). The first involved packing boxes on an assembly line, and Plaintiff was laid off after one month. Administrative Transcript ("Tr.") 36. The second job involved Plaintiff working as a personal care aide, helping senior citizens with in-home care. Plaintiff stopped working at that job after three months, and did not thereafter seek work, after she was hospitalized for taking an "overdose" of mental health medications following an argument with

---

[3] Plaintiff's Memo of Law, ECF No. 10-1 at p. 5 ("She claimed disability due to her mental health and hearing. Tr. 39.").

4

her boyfriend's brother. Tr. 35-36.[4]  In neither case did Plaintiff's impairments prevent her from performing her job duties.[5]

On April 30, 2019, after Plaintiff's claim was denied initially, a hearing was conducted before an Administrative Law Judge ("ALJ"), at which Plaintiff elected to proceed without an attorney.  The ALJ took testimony from Plaintiff and a vocational expert ("VE").  After the testimony, the ALJ left the record open and arranged to have Plaintiff undergo physical and mental independent medical examinations ("IMEs"), the reports from which she later added to the record.  The ALJ also had, in addition to Plaintiff's medical- and mental-health treatment records, a prior mental IME report and a functional assessment from Plaintiff's high school special education teacher, both completed in January 2018.  Additionally, the ALJ had an Individualized Education Plan ("IEP") from the Bath Central School District, completed in 2018.

The IEP indicated, in pertinent part, that Plaintiff had a WISC-IV full-scale IQ score of 91. Tr. 172.  Treatment providers and independent examiners also consistently estimated that Plaintiff's cognitive functioning was in the borderline-to-low-average range. *See, e.g.,* Tr. 174 ("According to the WISC-V scores, [she] scored 'low average' in Processing Speed."); Tr. 485 ("Intellectual functioning was likely between the low average and borderline ranges."); Tr. 509

---

[4] Plaintiff indicates that she took the medications because she was trying to calm down, not commit suicide. Tr. 922, 926.   However, when Plaintiff was first admitted to the ER, she claimed that she had taken the medication with the intention of killing herself. Tr. 907.   Oddly, though, Plaintiff did not go to the ER until two days after taking the pills. Tr. 907.

[5] The Court observes that when speaking to the consultative psychologist Plaintiff implied that she left the second job because she became overwhelmed by stress. Tr. 949.   However, at the hearing Plaintiff indicated that she stopped working because of her hospitalization following her alleged unintentional overdose. Tr. 36; 38 ("Q. And when did you do that job? A. Up until February, when I was hospitalized . . . .   Q. Okay.   And you said you only did that job for three months, and then you were in the hospital.   A. Yes.   Q. So before you went in the hospital, did you enjoy that job?   A. To a point.   It was stressful.    It got me to – Q. Why was it stressful?   A. It made me like – I was – I don't know.    It – I don't know if it was just like too much on my plate.    Like I thought like I had like they were depending on me, or --." [sic]).

("Cognitive functioning is in the borderline-low or mildly intellectually disabled range."); Tr. 952 ("Her level of intellectual functioning was estimated to be consistent with the low-average range of her age peers.").

The educational records further indicated that Plaintiff was in special education classes throughout her education, to address problems with attention, focus, distractibility, emotional lability, anger and difficulty completing assignments. *See, e.g.*, Tr. 161-168, 174.

Meanwhile, the psychologists who examined Plaintiff at the Commissioner's request opined that despite her mental problems, she would have no problem understanding, remembering, or applying simple directions and instructions, but would have some difficulty with understanding, remembering, and applying more complex directions, using judgment, interacting with others, working at a consistent pace, and maintaining a routine. *See, e.g.*, Tr. 486 ("Difficulties are caused by cognitive deficits, distractibility, and personality dysfunction. The results of the present evaluation appeared to be consistent with psychiatric and cognitive problems, although it is unclear as to whether or not they are significant enough to interfere with the claimant's ability to function on a daily basis."); Tr. 953 ("The claimant's difficulties functioning appear to be related to feelings of anxiety and depression, some evidence of a thought disorder, some evidence of attention problems, social anxiety, and slow processing of information.").

At the start of the hearing the ALJ reviewed with Plaintiff the records and exhibits that had been received and asked if there were any missing records. Tr. 30 ("Is there anything else out there that I should have?"). Plaintiff identified only a single set of records from a recent hospitalization, which the ALJ later obtained. Tr. 30-31. The ALJ further asked Plaintiff if she ever had any vocational training, and Plaintiff indicated only that she had received culinary arts

training at BOCES[6] in high school. Tr. 33.   The ALJ also asked Plaintiff if she was receiving "therapy," and Plaintiff responded affirmatively and identified a single mental-health therapist, whose records the ALJ already had. Tr. 49.   Finally, near the close of the hearing the ALJ asked Plaintiff if there was anything else that she might want to talk about that the ALJ had not already covered, and Plaintiff responded in the negative. Tr. 51.   As relevant to this Decision and Order, Plaintiff never indicated, at the hearing or in her written submissions to the Commissioner, that she had received vocational counseling.

During the hearing, when asked why she could not work, Plaintiff emphasized that she experiences auditory and visual hallucinations, Tr. 39-40, though those symptoms are not well supported in the mental health treatment records or the IME reports.[7] *See, e.g.*, Tr. 509 ("There is no history of paranoia or hallucinations."); Tr. 532 ("Denies hallucinations.").   Plaintiff also mentioned being stressed and having problems hearing.[8]  Tr. 39.

On August 30, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the application date and the date of the decision. Tr. 11-21.   The ALJ applied the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of "depression, anxiety, obesity, asthma, and hearing loss." Tr. 14.[9]

---

[6] Board of Cooperative Educational Services.
[7] For example, on June 1, 2016, Plaintiff's mental health counselor Marisa Wizeman, who had been treating Plaintiff for years, wrote that she had just learned about Plaintiff's alleged hallucinations (which primarily involved seeing and speaking to a twin sister who died in utero) from reading Plaintiff's journal. Tr. 341 ("She did endorse in her journal that she sees things and hears things that aren't there . . . Today is the first writer has been made aware of this concern.").
[8] As to Plaintiff's ability to hear, the record is clear that she has bilateral hearing loss and was prescribed hearing aids.   However, a consultative examiner also noted that Plaintiff "was able to hear normal conversation without visually seeing the examiner's mouth or face." Tr. 945.
[9] The ALJ found that Plaintiff's impairments, including a non-severe seizure impairment, did not, either singly or in combination, meet or medically equal a listed impairment. Tr. 14-15.   Plaintiff has not objected to the ALJ's findings at the first three steps of the sequential evaluation.

The ALJ further found that Plaintiff had the RFC to perform work at the medium exertional level,

> except [she] must avoid fumes, odors, dust, and poor ventilation. She can perform no activities requiring fine hearing acuity. She is able to understand, remember, and carry out simple, routine, repetitive instructions. She requires low stress jobs defined as no production rate paced work, and only occasional changes in job setting and only occasional decision-making responsibilities.

Tr. 15-16. The ALJ found that with such RFC, Plaintiff could not perform any past relevant work, since she had no such past work, but could perform other specific jobs in the national economy which the VE had identified. Tr. 20. Consequently, the ALJ found that Plaintiff was not disabled.

The ALJ stated that in making her RFC determination she had "considered the medical opinion(s) and prior medical finding(s) in accordance with the requirements of 20 CFR 416.920c." Tr. 16. The ALJ discussed the medical opinion evidence, consisting of an opinion from a state-agency medical consultant and the opinions of the two consulting psychologists who examined Plaintiff in 2018 and 2019, respectively.[10] The ALJ found that the state consultant's opinion was "not persuasive" since it was stale and inconsistent with the results of later testing. Tr. 18. However, the ALJ found that the opinions of the two consultative psychologists were each "partially persuasive." Tr. 18. Basically, in that regard, the ALJ declined to adopt portions of those reports that she found to be inconsistent with other evidence in the record. Tr. 18. For example, the ALJ declined to include any limitation on Plaintiff's interactions with other people in the RFC finding, even though the consultative psychologists had indicated, based largely, if not exclusively, on Plaintiff's self-reporting,[11] that Plaintiff might

---

[10] The Court here is referring only to opinions concerning Plaintiff's mental impairments. There seems to be no dispute between the parties concerning the ALJ's findings relating to any physical impairment. In any event, the ALJ found that the additional opinion of the medical doctor who performed the consultative internal medical examination was "generally persuasive." Tr. 18.

[11] Neither psychologist reported having personally observed any behaviors suggesting that Plaintiff cannot get

8

have difficulty interacting with others.[12] The Court observes that the ALJ's decision on that point is supported by substantial evidence since, for example, there is no indication that Plaintiff had any problem interacting with anyone at either of the two jobs she held.

Plaintiff sought review by the Appeals Council. Tr. 159. The Appeals Council advised Plaintiff that she could submit additional evidence, Tr. 6, but she chose not to do so, nor did she identify any gaps in the record. Tr. 130. Rather, Plaintiff asserted that review was warranted because her condition had worsened. *Id*. The Appeals Council declined to review the ALJ's ruling. Plaintiff then retained an attorney and commenced this action.

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ failed to develop the record, in that she should have obtained "vocational counseling records" from ACCES-VR[13] and ordered IQ testing; and 2) the ALJ made the mental aspect of her RFC finding based only on her own lay opinion and interpretation of raw medical data.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

---

along with other people.

[12] *See*, Tr. 486 (Indicating that Plaintiff would be moderately limited in "interact[ing] adequately with supervisors, coworkers, and the public[.]"); Tr. 953 ("She showed evidence of a moderate limitation concerning her ability to interact adequately with supervisors, coworkers and the public.").

[13] ACCES-VR refers to "Adult Career and Continuing Education Services-Vocational Rehabilitation," an agency of the New York State Education Department. *See*, www.acces.nysed.gov/vr   According to the agency's website, "Adult Career and Continuing Education Services-Vocational Rehabilitation (ACCES-VR) starts with the presumption that all individuals with disabilities can benefit from vocational rehabilitation services and should have opportunities to work in jobs integrated within their communities.   Vocational Rehabilitation Counselors guide individuals through service programs they need to reach their employment goal."

DISCUSSION

The ALJ's Alleged Failure to Develop the Record

Plaintiff maintains that the ALJ erred by failing to develop the record in two respects: First, by failing to obtain vocational counseling records from ACCES-VR; and, second, by failing to obtain IQ testing. Plaintiff maintains that it was necessary for the ALJ to obtain records from ACCES-VR since her mental health treatment records contain references to her receiving career counseling from that agency.[14] Plaintiff further contends that the ALJ erred in failing to obtain IQ testing since one of the independent examiners indicated that such testing could be used to "rule out borderline intellectual functioning."[15] However, the Court does not find that the ALJ committed reversible error in either respect.

The legal principles applicable to this claim, involving an ALJ's duty to develop the record, are generally well settled:

> "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). "Whether dealing with a *pro se* claimant or one represented by counsel, the ALJ must 'develop [the claimant's] complete medical history.'" *Lopez v. Comm'r of Soc. Sec.*, 622 Fed.Appx. 59, 60 (2d Cir. 2015) (summary order) (citing 20 C.F.R. § 404.1512; *Perez*, 77 F.3d at 47 (describing duty to develop record)). "[T]he agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 Fed.Appx. 7, 9 (2d Cir. 2014) (summary order)

---

[14] Specifically, the record contains three brief references to ACCES-VR: Tr. 425 ("However ct (Plaintiff) is going to pursue SSI benefits and is working with ACCESS VR to help plan for vocational goals for the future."); Tr. 817 ("W[riter] and care manager discussed options in terms of Sedgwick house, linking to Arbor Development supported housing and/or securing services from ACCESS VR and encouraged [Plaintiff] that she needs to take initiative and follow through as she is an adult."); Tr. 835 ("W[riter] met with [Plaintiff] and care manager for first part of session.  How [Plaintiff] was using school, clinic, care manager, ACCESS VR resources to help her stay organized and proactively manage stress (as per tx plan objective) was discussed.").

[15] *See*, report of Amanda Slowik, Psy.D., Tr. 486 (Diagnosis: . . . Rule out borderline intellectual functioning.  . . . Recommendations: IQ evaluation.").

10

(quoting *Rosa v. Callahan*, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999)). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue*, 474 Fed.Appx. 801, 804 (2d Cir. 2012) (unpublished opn.) (quotations and citations omitted).

*Gonzalez v. Colvin*, No. 1:15-CV-00767(MAT), 2018 WL 1040250, at *2 (W.D.N.Y. Feb. 24, 2018).   On the other hand,

[w]hile an ALJ does have an affirmative duty to develop the record, even if a Plaintiff is represented by counsel, the primary duty rests with Plaintiff to present evidence that he has functional limitations rendering him incapable of performing substantial gainful activity. 42 U.S.C. § 423(d)(5)(A), applicable to SSI through 42 U.S.C. § 1382c(a)(3)(H)(i); 20 C.F.R. §§ 404.1512(c), 404.1545, 416.912(c), 416.945(a)(3); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his medical condition, to do so."); SSR 17-4p, 2017 WL 4736894 *1 ("Although we take a role in developing the evidentiary record in disability claims, claimants and their appointed representatives have the primary responsibility under the Act to provide evidence in support of their disability or blindness claims.").

Moreover, an ALJ has no obligation to obtain additional evidence when the record is already sufficiently developed to allow for a determination as to disability. *See* 20 C.F.R. §§ 404.1520b(b)(1)-(2), 416.920b(b)(1)-(2) (If the evidence is incomplete or inconsistent but sufficient for the ALJ to make a decision, he will make a decision based on the existing evidence); *see also Perez*, 77 F.3d at 48 (the ALJ is not required to obtain additional evidence when the record is "adequate for [the ALJ] to make a determination as to disability.").

*Daniel R. v. Comm'r of Soc. Sec.*, No. 20-CV-00589-MJR, 2021 WL 1747788, at *6 (W.D.N.Y. May 4, 2021).

Applying these principles to the facts as set forth above, the Court finds that the ALJ did not err.  In that regard, the Court notes preliminarily that the ALJ developed the record

significantly by obtaining new independent medical and psychological examinations and missing medical treatment records. Indeed, the ALJ obtained all records of which she had been made aware. Additionally, the ALJ gave Plaintiff the opportunity to submit any other records that she wished to provide in support of her claim. However, Plaintiff, who despite being *pro se* was obviously in the best position to know what treatment she had received, made no objection to the completeness of the record.

More importantly, there were no obvious gaps in the record. For example, with regard to the alleged missing records from ACCES-VR, Plaintiff never mentioned receiving vocational counseling from that entity, despite having been asked by the ALJ several times at the hearing if there was any additional evidence that she wanted the ALJ to consider. Rather, Plaintiff faults the ALJ for failing to notice three fleeting references to ACCES-VR contained within hundreds of pages of treatment notes, indicating only that VR Access *may have* provide Plaintiff with some advice on making the transition from high school to the workforce. The actual existence and/or relevance of any records from ACCES-VR is unclear, since Plaintiff has not obtained them or made any offer of proof as to what they may contain. Regardless, there was no obvious gap in the record concerning ACCES-VR.

Similarly, there was no obvious gap in the record with regard to IQ testing. As noted earlier, the record already contained test results indicating an IQ score of 91, and school officials, treatment providers and independent examiners all agreed that Plaintiff's cognitive abilities were in the low-average-to-borderline range.[16] Plaintiff has offered no reason to doubt those assessments. Rather, Plaintiff merely seizes upon the fact that one of the independent

---

[16] Tr. 172, 174, 485, 509, 522, 952.

examiners suggested that IQ testing be obtained to "rule out" a diagnosis of "borderline intellectual functioning." Tr. 486. However, an ALJ is not required to obtain such additional testing where the record is already sufficiently developed. *See, e.g., Sherri M. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1319-DB, 2021 WL 809995, at *9 (W.D.N.Y. Mar. 3, 2021) ("[T]he record before the ALJ sufficiently documented Plaintiff's mental impairments and treatment, and the ALJ was not obligated to order cognitive testing simply based on Dr. Duffy's 'rule out' mild neurocognitive disorder."). Moreover, the most-recent psychiatric evaluation report obtained by the ALJ contained no such recommendation. Furthermore, even Dr. Slowik, who recommended IQ testing, indicated that Plaintiff's cognitive impairments did not limit her ability to understand, remember or apply simple directions and instructions,[17] which is consistent with the RFC finding. The Court finds there was no obvious gap in the record as to IQ testing.

In sum, Plaintiff has not shown that the ALJ erred in failing to develop the record.

<u>The ALJ's Alleged Failure to Properly Evaluate Medical Opinion Evidence</u>

Plaintiff next contends that the ALJ "erred by making the mental portion of her [RFC] determination without finding any [medical] opinions persuasive, and instead relying on her own lay interpretation of the raw medical data."[18] However, the Court disagrees.

The applicable legal principles on this point are well settled, beginning with the fact that it is not required that an ALJ's RFC finding perfectly correspond to any particular medical opinion:

> "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *1 (S.S.A. July 2, 1996) (emphasis added). Therefore, the ALJ's

---

[17] Tr. 486.
[18] ECF No. 10-1 at p. 1.

> RFC determination need not perfectly correspond with any one of the opinions of the medical sources cited in his or her decision, so long as he or she has "weigh[ed] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

*Violet-Maria R. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0999 (CJS), 2021 WL 1169186, at *4 (W.D.N.Y. Mar. 29, 2021).

An ALJ, though, cannot arbitrarily substitute his own lay opinion for competent medical opinion evidence. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)."). However, as just mentioned, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, *inter alia*, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

Here, it is simply incorrect for Plaintiff to argue that because the ALJ did not find any single medical opinion *completely* persuasive, her RFC opinion is unsupported by medical

14

opinion evidence and must have resulted from her own lay interpretation of raw medical data.[19] Nor has Plaintiff otherwise shown that the mental aspect of the RFC finding is inconsistent with the record as a whole or unsupported by substantial evidence.  The Court consequently finds that this aspect of Plaintiff's motion also lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.10) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 11) for the same relief is granted. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
August 9, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

[19] *See, e.g.*, Plaintiff's Reply, ECF No. 12 at p. 2 ("[T]he ALJ erred by finding every opinion only partially persuasive.  As noted, this was not a case where the ALJ cold make an RFC *without medical opinion evidence*, and remand is required.") (citations omitted, emphasis added).